

_____

No. 3:17-CV-615-CWR-LGI

SUSAN GREER,

*Plaintiff,*

*v.*

UNUM LIFE INSURANCE
COMPANY OF AMERICA &
UNUM GROUP CORPORATION,

*Defendants.*

_____

ORDER GRANTING DISABILITY BENEFITS

_____

Before CARLTON W. REEVES, *District Judge*.

Plaintiff Susan Greer seeks judicial review of the final decision
of Unum Life Insurance Company of America, denying her
long-term disability insurance benefits under an employee

welfare benefit plan ("the Plan"). Before the Court are the parties' cross-motions for summary judgment.[1]

For the reasons stated below, the Court denies the defendants' Motion for Summary Judgment and grants plaintiff's Motion for Summary Judgment.

## I.

### Undisputed Facts[2]

Susan Greer was a legal secretary at the law firm Baker, Donelson, Bearman, Caldwell & Berkowitz ("Baker Donelson"). Greer has been a legal secretary for nearly 30 years. She joined Baker Donelson shortly after it opened its Jackson office. She assisted three shareholders in the firm's litigation practice until a horrific car accident.

On May 22, 2014, Greer was on her way to work, traveling north on I-55, when an 18-wheeler logging truck lost control and crossed into incoming traffic. The truck collided with Greer head-on "at highway speed."[3] Immediately thereafter, a van collided into the back of Greer's vehicle. Greer suffered multiple broken bones in her right leg and ankle, broken ribs, a hernia, multiple hematomas, and a head injury.

---

[1] Docket Nos. 48 and 50.

[2] In a footnote, Unum argues that Unum Group Corp. should be dismissed because it is not a party to the contract. Greer has not responded in opposition. Accordingly, Unum Group Corp. is hereby dismissed from this case.

[3] Docket No. 34-1 at 205.

Greer was taken to the University of Mississippi Medical Center for emergency treatment. An external fixation device was installed to stabilize her fragmented leg and ankle. Her operating surgeon noted that it was "one of the worst [ankle] fractures he had seen."[4] The following day, Greer had abdominal exploration surgery and hernia repair caused by the seatbelt and airbags. A few weeks later, Greer underwent surgery to remove the leg external fixation device and repair the extensive damage to her ankle with plates and screws.

Greer's surgeon, Dr. Matthew Graves, noted the following in his operative report: "Greer must remain strictly non-weight bearing on this side. The chances of her developing arthritis of this ankle are extremely high secondary to the severity of the injury."[5] The report also states that Greer has a strong probability of developing avascular necrosis, which means death of bone tissue due to a lack of blood supply, in her ankle.

In July 2014, Greer submitted a claim for long-term disability ("LTD") benefits to Unum. In support of her application, Greer submitted an Attending Physician's Statement from Dr. Graves, dated July 23, 2014. Dr. Graves noted the primary diagnosis impacting Greer's functional capacity was a "talus" (ankle) fracture;[6] Dr. Graves recommended no work, physical

---

[4] *Id.* at 205.

[5] Docket No. 34-2 at 413.

[6] The talus is the main connector between the foot and the leg. The American Academy of Orthopaedic Surgeons explains that these fractures often occur "during high energy events, such as a car collision."

therapy, and continued office visits. On August 20, 2014, Unum approved Greer's claim and began making monthly disability payments.

As part of a "New Claim Triage," Unum estimated that Greer would return to work 8-12 weeks after her June surgery. Additionally, based on a job description for a legal secretary at Greer's law firm, Baker Donelson, the New Claim Triage stated: "Occupational Information: Based on review of JD, occupation requires lifting 10 pounds, mostly sitting, occasional stand/walk, and frequent fingering/keyboarding."[7]

On August 28, 2014, Greer consulted neurosurgeon, Dr. Michael Molleston, concerning lower back and neck pain that had spread to her right shoulder, arm, legs, and upper extremities including fingertips. Dr. Molleston's clinical assessment was "significant trauma of the right lower extremity and abdomen – both necessitating emergency surgery and currently preventing her from walking or assuming preaccident level of function."[8]   After a second visit in September 2014, Dr. Molleston noted that an MRI revealed bulging discs in her

---

And, "[b]ecause the talus is important to ankle movement, a fracture often results in substantial loss of motion and function." https://ortho-info.aaos.org/en/diseases--conditions/talus-fractures (last visited Sept. 30, 2021).

[7] Docket No. 34-1 at 198.

[8] Docket No. 34-5 at 506.

4

spine. He recommended cervical neck surgery to repair the damage "after she has recovered from her other surgeries."[9]

Dr. Molleston operated on February 26, 2015, reporting: "[t]he findings were severe cord compression with fresh herniated disk at C4-C5 and C5-C6."[10]  The report described the cervical fusion using several plates, screws, and harvested bone. Greer had follow-up appointments on March 6, April 7, and May 19, 2015. On May 19, 2015, a nurse practitioner noted Greer's post-operative condition, as follows:

> She is doing well with no complaints. Her neck pain has resolved. She has good strength in the UE. She has no complications from surgery. Recommend neck exercises and follow-up with Dr. Molleston as needed. She is released from routine follow-up care.[11]

Greer next saw Dr. Molleston for a follow up on October 5, 2015. In the report of his examination, he found her "Cervical Spine ROM" to be normal with "active pain free range of motion."[12] It also described her gait as normal and her posture as symmetrical. However, the report goes on to state:

> [Greer] has numbness and tingling in her arms, at times at one side or the other . . . . She

---

[9] *Id.*

[10] Docket No. 34-2 at 539.

[11] *Id.* at 533.

[12] Docket No. 34-3 at 810.

5

> continues to have difficulty standing, sitting, bending, crawling, and climbing. We talked about return to work and I told her at this point she has impairment of her cervical spine, impairment of her lumbar spine, and then impairment of her lower extremity to the point that she is not able to pursue substantial gainful activity.[13]

Unum received this report on October 15, 2015.

At the same instant, however, Unum nurse Janet Sheppard reported on October 9, 2015, that Greer was physically able to return to work. Specifically, she found that "Clinical findings do not support functional deficit/loss of such magnitude as to preclude Ms. Greer from performing the physical demands required in her occupation on a full time basis. Additionally, [restrictions and limitations] provided do not appear to preclude full time work requiring sedentary exertion."[14]

Those were not the end of Greer's impairments. For balance issues and lightheadedness, she was referred to Dr. Gerald Gianoli. Dr. Gianoli diagnosed her with perilymphatic fistula, which he described as a "leak of fluid from inner ear causing hearing loss, vertigo/dizziness and/or tinnitus."[15] On July 30, 2015, Greer underwent surgery for her inner ear problem. According to Dr. Gianoli's operative report, the surgery was

---

[13] *Id.*

[14] Docket No. 34-2 at 790.

[15] *Id.* at 745.

"uneventful."[16] He also states Greer was "doing great. No vertigo & imbalance improving. No nausea."[17] Still, Dr. Gianoli maintained the following indefinite restrictions and limitations ("R&Ls"): "No driving, climbing, operating heavy machinery or any other activity where poor balance places self or others at risk."[18]

On March 9, 2015, Unum recommended that Greer apply for Social Security benefits. It hired GenEx, Social Security Disability Advocates, to assist her. Greer, though, had trouble filling out forms due to her recent spine surgery. Ultimately, she declined GenEx's services, and her sister, who had previously worked at the Social Security Administration ("SSA") assisted her through the process. On April 23, 2015, Greer submitted her paperwork. She was approved for SSA disability benefits on September 29, 2015. As a result of the approval, which was retroactive to the date of the accident, Greer was required to reimburse Unum $17,912.

As part of the SSA determination, Greer underwent a comprehensive mental status evaluation by Dr. Lisa Yadzani. Dr. Yadzani's diagnostic impressions concluded that Greer suffered from chronic posttraumatic stress disorder, recurrent and severe major depressive disorder, and generalized anxiety disorder with panic attacks.

---

[16] *Id.* at 712.

[17] *Id.*

[18] *Id.* at 706.

Upon receipt of the SSA files, Unum's consultant reported that the file "does not contain any decisional information or rationale."[19] The consultant concluded, "I am unable to advise you of the medical basis of SSDI Approval, Physical or Mental as such detail is NOT contained in the SSDI claim file received."[20]

On June 4, 2015, Greer returned to see Dr. Graves for her one-year post-operative ankle surgery visit. His report of the visit stated that she was still walking awkwardly. He noted that trouble walking was "alleviated with rest and medications and exacerbated with increased activity."[21] Her primary complaint was mild swelling with ankle pain. Dr. Graves responded to Unum's request for information on September 22, 2015, December 22, 2015, and October 11, 2016. His September response stated that Greer could not climb stairs, stand for more than 1-2 hours, and that she had a gait abnormality and ankle weakness. On December 22, Dr. Graves' report goes on to state:

> She is unable to return to her previous employment and suffers from ankle stiffness that is not improving, gastrocnemius equinus right side, and has a gait abnormality. She does have ankle arthritis. Ms. Greer may need a cane as an assistive device. She does have difficulty climbing

---

[19] Docket No. 45 at 1943.

[20] *Id.* (emphasis in original).

[21] Docket No. 34-2 at 682.

> stairs and standing for a long period of time
> (more than 30 minutes).
>
> She may possibly need a referral to a foot/ankle
> orthopedic specialist in the future for further
> workups and surgical evaluation for chronic an-
> kle pain and arthritis, if needed.[22]

Greer again saw Dr. Molleston on August 31, 2016 and Febru-
ary 15, 2017. Dr. Molleston responded to Unum's request for
information on May 23, 2016, noting:

> She is limited functionally with inability to
> stand more than 2 hours in an 8 hour day, She
> cannot use her hands for longer than 30 minutes
> at a time and no more than 4 hours in an 8 hour
> day. She cannot do overhead work, cannot push
> or pull, and cannot climb, crawl, or stoop. She
> cannot lift more than 10 pounds occasionally,
> and should do no lifting on a regular basis. She
> is unable to return to any work, even her previ-
> ous work as a secretary. None of her other treat-
> ing physicians have released her to work.[23]

Thus, as late as 2017, Greer's attending physicians all re-
ported that she could not return to work.

In November 2015, Unum employees discussed Greer's claim.
They concluded that "the R&Ls from Dr. Graves do not

---

[22] Docket No. 34-4 at 1474.
[23] Docket No. 45 at 1968-9.

preclude the demands of the [employee's] occupation as described as above . . . .The R&Ls from Dr. Gianoli do not preclude the [employee's] occupational demands either. The R&Ls from Dr. Molleston are overly restrictive. Dr. Molleston's exam documents normal gait, UE strength and ROM."[24]

Throughout this entire process, Greer's claim had been evaluated using the physical demands identified in the New Claim Triage. On September 1, 2016, however, over two years after Greer's claim was accepted by Unum, Claims Director Robert Brown requested a report identifying the material and substantial duties and physical requirements of her occupation.

The same day, a Vocation Rehabilitation Consultant replied reporting 13 "material and substantial duties" and the following physical demands: Exerting up to 10 pounds of force *occasionally* and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. *Constant sitting and keyboarding*; *Frequent reaching, handling* and fingering; and occasional standing and walking.[25]

Later that same day, Robert Brown requested an "Whole Person Analysis" addressing whether the current evidence available for review reasonably supports that Greer is "unable to work full-time within the sedentary range of functional

---

[24] Docket No. 34-3 at 858.

[25] Docket No. 45 at 1970-1 (emphasis added).

demands." The request defined "Sedentary Work" as "Lifting, Carrying, Pushing, Pulling up to 10 Lbs. occasionally. Mostly sitting, may involve standing or walking for brief periods of time, occasionally throughout the day."[26]

This description varies from that of the New Claim Triage and the report of the same day. For example, it omitted fingering and keyboarding all together.

Less than a week later, the Whole Person Analysis concluded that it was unclear because the medical evidence was inconsistent. It added that Dr. Molleston offered no explanation as to why the exam findings were "unremarkable" but there were multiple R&Ls documented and no new injury reported. The report recommended hiring an Independent Medical Examiner.

Unum arranged for Greer to be examined by such an Independent Medical Examiner ("IME"). On September 29, 2016, the IME, Dr. Lee, analyzed whether Greer could perform "Sedentary Work: frequent sitting, fingering and keyboarding; occasional standing, walking, and lifting up to 10 pounds." He reported that she could "clearly sit, use her fingers, and occasionally walk and stand."[27] He further noted that "crying spells," which Greer self-reported, could be accommodated by "privacy for up to 10 minutes at a time."[28]

---

[26] *Id.* at 1972.

[27] Docket No. 45-1 at 2840.

[28] *Id.*

Armed with this information, on October 19, 2016, Unum terminated Greer's LTD benefits. For the first time, Unum referred to the physical demands noted in its September 2016 report, including "constant sitting and keyboarding." Unum listed the many R&Ls from Greer's various doctors but concluded, based on Unum's clinicians and the IME, that she could return to work. Further, it noted that it received a portion of the SSA file, and the SSA's physical findings were undermined by new evidence including the IME report, and that Greer had received 24 months of benefits related to mental health and thus, the SSA's mental health determinations could not support continued LTD benefits.

Greer appealed this decision. Unum collected additional information from her physicians. An Unum physician, Dr. Jerry Beavers analyzed the appeal. Still, Unum denied Greer's appeal on May 1, 2017, primarily relying on the same evidence from the initial denial.

This action followed.

## II.

### Abuse of Discretion Analysis[29]

The Employment Retirement Income Security Act of 1974 ("ERISA") authorizes federal courts to review determinations made by employee benefit plans, including disability plans.[30] Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits."[31] "Standard summary judgment rules control in ERISA cases."[32] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law."[33]

When a plan administrator has discretionary authority to interpret the plan's terms and determine benefit eligibility, a court reviewing the denial of a claim must assess whether the

---

[29] As an initial matter, the Court initially granted limited discovery in this case pursuant to *Crosby v. Louisiana Health Serv. & Indem. Co.* Upon further review, however, the Court has determined that the discovery generated during that process was not probative of the ultimate questions. Thus, for purposes of this Order, the Court has limited its review to the Administrative Record (the "Record"), without considering any depositions or exhibits thereto in determining whether Unum abused its discretion in denying Greer's claim for LTD benefits.

[30] 29 U.S.C. § 1132(a)(1)(B).

[31] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003).

[32] *Ramirez v. United of Omaha Life Ins. Co.*, 872 F.3d 721, 725 (5th Cir. 2017).

[33] Fed. R. Civ. P. 56(a).

administrator abused that discretion.[34] A plan administrator abuses its discretion if it acts "arbitrarily or capriciously"[35] or, put otherwise, if its determination is not supported by "substantial evidence."[36] "A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence."[37] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[38]

A plan administrator's decision must be upheld if review "assures that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end."[39] A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly

---

[34] *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246, 247 (5th Cir. 2018) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)); *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 767 (5th Cir. 2018) (internal citations omitted).

[35] *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999) (quoting *Sweatman v. Commercial Union Ins., Co.*, 39 F.3d 594, 601 (5th Cir. 1994)).

[36] *Killen v. Reliance Stand. Life Ins. Co.*, 776 F.3d 303, 307 (5th Cir. 2015) ("If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail.").

[37] *Foster v. Principal Life Ins. Co.*, 920 F.3d 298, 304 (5th Cir. 2019) (citation omitted).

[38] *Ellis v. Liberty Life Assur. Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004) (quotations omitted).

[39] *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 247 (5th Cir. 2009).

14

supports the basis for its denial.[40] An ERISA claimant bears the burden to show that the administrator abused its discretion.[41] In determining whether a plan administrator abused its discretion, this Court must weigh several different case-specific considerations.[42]

In this case, because Greer's plan grants Unum "discretionary authority to determine eligibility for benefits under the plan" and "to interpret the plan's provisions," the Court reviews Unum's decision for abuse of discretion.[43]

### A.    Material and Substantial Duties

Greer contends that Unum's termination of her LTD benefits was an abuse of discretion for several reasons. Most relevant here, she avers that Unum failed to evaluate whether she could perform the material and substantial duties of her own occupation—legal secretary—considering her documented functional restrictions and limitations. Instead, Greer argues, Unum considered only whether she could perform the physical demands of general sedentary work. Essentially, Greer argues that Unum analyzed her claim under the "any occupation" standard, rather than the "own occupation" standard the Plan requires. Next, Greer argues Unum arbitrarily disregarded her treating physicians' opinions. Then, she contends

---

[40] *Id.* at 246.

[41] *George v. Reliance Stand. Life Ins. Co.,* 776 F.3d 349, 352 (5th Cir. 2015).

[42] *Nichols v. Reliance Std. Life Ins. Co.,* 924 F.3d 802, 808 (5th Circ. 2019) (quoting *White v. Life Ins. Co. of N. Am.,* 892 F.3d 762, 767 (5th Cir. 2018)).

[43] *Ellis v. Liberty Life Assur. Co. of Boston,* 394 F.3d at 269 (citations omitted).

that Unum breached its fiduciary duty by cherry-picking and distorting the evidence in the Record.

Unum responds that none of the above constitutes an abuse of discretion.

Unum does not dispute that Greer performed a variety of secretarial duties for three litigation shareholders which required "exerting up to 10 lbs. occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, constant sitting and keyboarding, frequent reaching, handling, and fingering, and occasional standing and walking." Rather, Unum contends that its decision to evaluate Greer's claim using a less demanding list of physical requirements was reasonable, and that its references to sedentary occupation was not an abuse of discretion.

"Eligibility for benefits under any ERISA plan is governed in the first instance by the plain meaning of the plan language."[44] And the Fifth Circuit has recognized "that although a deferential standard is 'absolutely necessary,'" "fidelity to the written terms of an employee benefit plan is essential to give effect to one of the central purposes of ERISA -- to protect the beneficiaries of benefit plans by insuring that employees are fully and accurately apprised of their rights under the

---

[44] *Threadgill v. Prudential Securities Group, Inc.,* 145 F.3d 286, 292 (5th Cir. 1998) (citations omitted).

16

plan."[45] This, the Fifth Circuit submits, is the very reason that the statute that governs ERISA plans requires such plans be governed by a written instrument.[46]

In addition to the plain language of the benefits plan, the Fifth Circuit has provided further clarification in interpreting common benefits plan language. Specifically, in *Burtch v. Hartford Life & Accident Ins. Co.*, the Fifth Circuit recognized that "the correct standard" to evaluate a Claimant's "regular occupation" is that job "in the national economy," rather than a "specific job for a specific employer."[47] Still, "the specific duties of the employee's job, as described by the employer, are relevant."[48] Put otherwise, "the precise duties do not define regular occupation," however, they cannot be ignored as "they well illustrate" occupational duties. [49]

An ERISA determination of disability benefits must be a reasoned determination, and "a benefits determination cannot be reasoned when the claims administrator sidesteps the central

---

[45] *In re HECI Exploration Co.*, 862 F.2d 513, 524 (5th Cir. 1988) (citing *Denton v. First Int'l Bank of Waco*, 765 F.2d 1295, 1304 (5th Cir. 1985)) (quotations omitted).

[46] *Id.*; *see also* 29 U.S.C. § 1102.

[47] *Burtch v. Hartford Life & Accident Ins. Co.*, 314 F. App'x 750, 755 (5th Cir. 2009).

[48] *Id.*

[49] *Id.* (quoting *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 396 (5th Cir. 2006)).

inquiry."[50] Courts have held "that an administrator's proper consideration of the claimant's ability to perform his or her job requirements in light of the relevant diagnosis is a significant factor to evaluate on arbitrary and capricious review."[51] "[T]he fact that [claimant] might be capable of sedentary work cannot be a rational basis for finding that he was not disabled, given that his former occupation required him to walk, stand, and reach for several hours a day."[52] In *McDonough v. Aetna Life Ins. Co.*, the First Circuit recognized that "passing references" in medical reviews to "the appellant's 'own occupation' or 'own sedentary level occupation'" when "unaccompanied by any attempt to articulate the material duties of the appellant's own occupation" was inadequate. This makes sense, as "it is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific job requirements of a position."[53]

---

[50] *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015) (quotations omitted.)

[51] *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 854 (3rd Cir. 2011) (collecting cases); *see also McDonough*, 783 F.3d at 381-83; *Doe v. Unum Life Ins. Co. of Am.*, 35 F.Supp.3d 182, 193 (D. Mass. 2014); *Conrad v. Reliance Standard Life Ins. Co.*, 292 F.Supp.2d 233, 240 (D. Mass. 2003); *Heim v. Life Ins. Co. of N. Am.*, 2012 WL 947137, at *11 (E.D. Pa. 2012).

[52] *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 507 (6th Cir. 2005).

[53] *Miller v. Am. Airlines, Inc.*, 632 F.3d at 854.

18

The Fifth Circuit indicated support for this position in *Burtch.* There, the court rejected an argument that the insurer erred by using "sedentary job" criteria to deny benefits, because the insurer "considered the claimant's actual job duties" under the policy's "own occupation" standard and only used sedentary as shorthand. In *Foster v. Principal Life Ins. Co.,* similarly, the Fifth Circuit "assumed without deciding" that its sister courts were correct in distinguishing between "any occupation" and "own occupation."[54]

In the present case, the plain language of the Plan required Unum to determine whether Greer could perform the "**material and substantial duties**" of her "**regular occupation.**"[55] "Material and substantial duties" are defined as duties that are "normally required" and "cannot be reasonably omitted or modified."[56] Rather than looking to Greer's "regular occupation" as performed for her "specific employer or at a specific location," Unum looks to Greer's occupation "as it is normally performed in the national economy."[57]

The Plan, thus, dictates the critical inquiry: whether Greer was able to perform the material and substantial duties of a legal secretary as the position was performed in the national economy. Essentially, this required Unum to first look to the particulars of Greer's Baker Donelson job description, then to

---

[54] *Foster v. Principal Life Ins. Co.,* 920 F.3d 298, 305 (5th Cir. 2005)

[55] Docket No. 34-1 at 99 (emphasis in original.)

[56] *Id.* at 119.

[57] *Id.* at 120.

accepted occupational resources to determine the essential functions of her occupation.[58] "Only then can a claims administrator distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination of whether or not the claimant is disabled."[59]

Unum did *eventually* do exactly that. It did not do so, however, until over two years from when the claim was first accepted and less than two months prior to terminating Greer's LTD benefits.

Greer's precise job duties include operating a computer, typewriter, and other general office equipment; typing at least 65 wpm and transcribing correspondence, memoranda, and other legal documents; screening telephone calls and recording messages; reading, sorting, and dating incoming mail; preparing outgoing mail and packages for shipment; establishing and maintaining an electronic calendar; maintaining all client and general files; receiving clients and visitors; scheduling appointments and conference calls; proofing, processing, and preparing client bills for mailing; entering time for attorneys; and performing typing, filing, and reception relief as requested. Additionally, Greer's job description noted that this "work occasionally requires a high level of mental

---

[58] *See McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015) ("Thus, a reasoned determination of the existence of disability vel non requires, inter alia, a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the national economy.").

[59] *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618-19 (6th Cir. 2006).

20

effort and strain when producing a high volume of information," among other requirements.[60]

On September 1, 2016, an Unum Disability Benefits Specialist (the employee supervising Greer's claim), submitted a request for the material and substantial duties and physical requirements of Greer's employment as defined by the national economy.

Unum's Vocational Rehabilitation Consultant then determined that, based on the Baker Donelson Job Description and the Enhanced Dictionary of Occupational Titles ("EDOT"), the material and substantial duties for a legal secretary included 13 tasks (*e.g.*, "composes and prepares routine correspondence," "proofreads legal documents," "answers telephone calls, provides information, and accurately handles received information," "remains knowledgeable of current legal procedures and terminology," and "may review law journals and other legal publications to identify court decisions pertinent to pending cases and submit articles to company officials").[61] This is the only occurrence in the Record where Greer's material and substantial duties were identified.

Unum never referenced any of these material and substantial duties on any other occasion in the Record. Accordingly, the Record reflects that none of Unum's consulting doctors or Greer's treating physicians ever considered these duties.

---

[60] Docket No. 34-1 at 135.

[61] Docket No. 45 at 1970-71.

21

The Vocational Rehabilitation Consultant also identified the "Physical Demands" of a legal secretary, as reproduced here:

> Sedentary: Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Constant sitting and keyboarding; Frequent reaching, handling and fingering; and occasional standing and walking.[62]

The report then provides the definitions of frequency, per the Revised Handbook for Analyzing Jobs: "Occasionally" is an activity or condition that exists up to 1/3 of the time or 0 - 2.5 hours in an 8-hour workday. Likewise, "Frequently" exists from 1/3 to 2/3 of the time or 2.5 - 5.5 hours, and "Constantly" exists 2/3 or more of the time or 5.5 – 8 hours. (The report including "material and substantial duties" and "physical demands," hereinafter, "EDot Report.")

The EDot Report is signed and certified as a "vocational assessment" by which the author "is capable of performing" "by training and experience." The author further certified that she had reviewed "all occupational and vocational evidence provided to me by Company personnel, including analysis of current limitations and restrictions by medical and clinical personnel" in preparing the EDot Report.

---

[62] *Id.* at 1971.

Unum does not dispute that the EDot Report identified Greer's material and substantial duties, nor that Greer's job requires the physical demands identified in the EDot Report. Rather, Unum claims that it may disregard the EDot report because the Record contains a second "summary" of the duties of a legal secretary. In legal terms, Unum argues that it was not an abuse of discretion to evaluate Greer's claim using it. Specifically, as part of a "New Claim Triage," one of Unum's employees submitted the following: "Occupational Information: Based on review of JD, occupation requires lifting 10 pounds, mostly sitting, occasional stand/walk, and frequent fingering/keyboarding."[63] Unum admits that "JD" refers to Greer's specific job duties as outlined in the Baker Donelson job description. (Hereinafter, "Occupational Information Summary.")

The Court is not persuaded by Unum's argument that it was reasonable to rely solely on the Occupational Information Summary.

First, the Occupational Information Summary does not identify the material and substantial duties of a legal secretary in the national economy. Indeed, it fails to mention "material," "substantial," or reference the "national economy." It cites to only one source, the Baker Donelson job description. It is unsigned and unclear whether it was authored by a "vocational rep" or the Director of LTB. At most, it merely identifies the physical demands of sedentary work. Greer's position

---

[63] Docket No. 34-1 at 198.

required more than just physical demands. As demonstrated by the findings of Unum's Vocational Rehabilitation Consultant, it required organizational, communication, social, and written skills.

Significantly, the Occupational Information Summary fails to quantify the physical demand of lifting 10 lbs., and quantifies "sitting" as "mostly"— a frequency that is never defined in the Record. As a result, the Record shows that even iterations of the Occupational Information Summary were inconsistent. For example, lifting and sitting were haphazardly revised to reflect "occasional" or "frequent."

To be clear, the difference between the physical demands in the EDot Report and the Occupational Information Summary are substantial:

| Physical Demand | Occupational Information Summary | EDot Report |
|---|---|---|
| Exerting up to 10 lbs. | Undefined | 0 - 2.5 hours; Or less than 10 lbs., 2.5 - 5.5 hours |
| Sitting | 4+ hours[64] | 5.5 – 8 hours |

---

[64] The definition of frequencies provided are defined by the *Revised Handbook for Analyzing Jobs (1991)*. "Mostly" is not defined in the Record, so the Court has used the term consistent with how it is generally understood. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) (underscoring that under the ordinary-meaning

24

| Keyboarding | 2.5 - 5.5 hours | 5.5 – 8 hours |
|---|---|---|
| Reaching | None | 2.5 - 5.5 hours |
| Handling | None | 2.5 - 5.5 hours |
| Fingering | 2.5 - 5.5 hours | 2.5 - 5.5 hours |
| Standing and Walking | 0 - 2.5 hours | 0 - 2.5 hours |

As noted above, it wasn't until September 1, 2016, over two years after Greer's claim was accepted, that Unum's Disability Benefits Specialist handling Greer's claim requested the EDot Report. Still, in denying her claim, Unum exclusively relied on the Occupational Information Summary and never referenced the material and substantial duties listed in the EDot Report.

Finally, frequently, neither the Occupational Information Summary nor the EDot Report identified Greer's specific occupation. Instead, it was simply referred to as "sedentary work," "sedentary range of functional demands," or "sedentary level function." For example, on October 3, 2016, the Director, Paul Gagnon, in agreeing "to pay the claim to decision date and close the file" noted that the employee's "occupation is described as SED," and the Independent Medical Evaluator "supports sustained SED level function."[65]

Although a plan administrator's decision need only fall "somewhere on a continuum of reasonableness—even on the

---

canon, "[w]ords are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense").

[65] Docket No. 45-1 at 2873.

low end,"[66] that does not authorize a plan administrator to ignore the essential functions and physical demands of a participant's regular occupation, particularly not when the Record includes the relevant information, and the plain language of the Plan requires it.

Unum's citation to Fifth Circuit precedent underscores that Unum missed the mark when evaluating Greer's claim.

In *Gothard v. Metro. Life Ins. Co.*, and *Holland v. Int'l Paper Co. Ret. Plan*, the policy at issue defined disability as an "inability to perform the essential duties of *any occupation* for which she is reasonably fitted by training, education, or experience on a full-time basis."[67] Unlike *Gothard* and *Holland*, the Plan language here unambiguously requires Unum to evaluate whether Greer could perform the duties of a legal secretary, not merely any job requiring comparable physical exertion. The Record, Unum's arguments, as well as Unum's reliance on these cases demonstrate that Unum did indeed evaluate Greer's claim using the wrong standard.

Further, Unum's reliance on *Burtch* is misguided. *Burtch* held that when a Plan defines disability eligibility by the

---

[66] *Holland*, 576 F.3d at 247 (quoting *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007)).

[67] *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 248 (5th Cir. 2007); *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d at 244 ("[A] total disability . . . is a medically determinable physical or mental impairment or diagnosed terminal illness which renders the Participant incapable of performing any occupation or employment for which the Participant is qualified by education, training or experience.").

participant's "regular occupation," evaluation requires more than just a consideration of the participant's precise job duties. Here, Unum did only that—it relied on a summary of the physical demands of Greer's precise job duties, rather than looking to "the correct standard" (*i.e.*, accepted occupational resources) to determine the essential functions of that job "in the national economy." [68]

Unum further asserts that, even if the EDot Report correctly identified Greer's physical demands, it was reasonable to conclude that her duties did not actually involve "constant" fingering and keyboarding given the number of duties identified which do not involve fingering/keyboarding. Unum does not identify which of the 13 tasks identified by its own Vocational Rehabilitation Consultant do not involve fingering/keyboarding. The Court is not persuaded by Unum's position. Given the ubiquitous rise of computer technology in the legal profession, arguably all 13 tasks involve fingering and keyboarding. Unum's effort to undermine its own Vocational Rehabilitation Consultant must be based on concrete evidence in the Record, not post-litigation conjecture. A decision is supported by substantial evidence only when it is "justified by a fair estimate" of "the record as a whole." [69] This argument is not supported by the Record.

---

[68] *Burtch v. Hartford Life & Accident Ins. Co.*, 314 F. App'x 750, 755 (5th Cir. 2009).

[69] *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 466, 488 (1951).

Finally, Unum points to the letter regarding the termination of Greer's benefits and the denial of her appeal, which it asserts demonstrate that her claim was evaluated using "constant keyboarding/fingering."[70] Not so. Again, at no point in the Record does Unum consider the 13 material and substantial duties. Where Unum described the Occupation Information Summary's physical requirements, it did so inconsistently. Moreover, it has exclusively deferred to a definition that requires only "frequent" keyboarding/fingering, rather than "constant" keyboarding/fingering, and there is significant countervailing medical evidence that Greer could not even perform the less demanding requirements. Mere recitation of the appropriate physical demands in two denial letters does not constitute substantial evidence that Greer can finger and keyboard on a constant basis.

The Fifth Circuit has recognized "the importance of fidelity to the plain language of a plan."[71] In this case, the Court holds that it is unreasonable to allow Unum to gut the plain and unambiguous language of its own Plan. "Where the Plan's definition of disability is limited to the plaintiff's duties at her former job (as opposed to the broader SSA definition of any job

---

[70] Docket No. 58 at 6 ("Unum used the 'constant' keyboarding requirement in evaluating Greer's eligibility for benefits, including the letters to her regarding the termination of her benefits and the denial of her appeal.")

[71] *In re HECI Exploration Co.*, 862 F.2d 513, 524 (5th Cir. 1988) (citing *Denton v. First Int'l Bank of Waco*, 765 F.2d 1295, 1304 (5th Cir.1985)) (internal quotations omitted).

for which she is qualified), an administrator should give extra pause before terminating disability benefits."[72] That did not happen here.

### B. Consideration of Medical Evidence

"[M]ost disputed claims for disability insurance benefits are awash in a sea of medical evidence, often of contradictory nature,"[73] and this case is no exception. The Fifth Circuit has made clear that "the job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans."[74] "Plan administrators are not required to accord a treating physician any special weight."[75] Nevertheless, "plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."[76]

From the date of Greer's car accident until the termination of her LTD benefits, her attending physicians were adamant that she could not return to work or perform the physical demands of the Occupation Description Summary. "She is not able to pursue substantial gainful activity"[77]; "She is unable

---

[72] *Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp. 2d 724, 735 (S.D. Tex. 2005) (citation omitted).

[73] *Killen v. Reliance Std. Life Ins. Co.*, 776 F.3d 303, 308 (5th Cir. 2015) (citing 10A Couch on Ins. § 147:33).

[74] *Gothard v. Metro. Life Ins. Co.*, 491 F.3d 246, 250 (5th Cir. 2007).

[75] *Id.*

[76] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

[77] Docket No. 34-3 at 810.

to return to her previous employment and suffers from ankle stiffness that is not improving"[78]; and "She is unable to return to any work, even her previous work as a secretary," they wrote.[79]

Based upon reviews solely of the paper record, Unum's clinicians determined that the restrictions, limitations, and explanations provided by Greer's attending physicians were "unclear,"[80] "inconsistent,"[81] "overly restrictive,"[82] and that they "do not appear to preclude full time work requiring sedentary exertion."[83] Dr. Lee, an Independent Medical Examiner hired by Unum, physically examined her, and determined that "she clearly can sit, use her fingers, and occasionally walk and stand."[84] He concluded that she could perform full time work within the sedentary range of functional demands defined as: "Sedentary Work: frequent sitting, fingering and keyboarding; occasional standing, walking, and lifting up to 10 pounds."[85]

---

[78] Docket No. 34-4 at 1474.

[79] Docket No. 45 at 1968-9.

[80] *Id.* at 1973.

[81] *Id.*

[82] *Id.* at 1970-1.

[83] *Id.*

[84] Docket No. 45-1 at 2840.

[85] Docket No. 45 at 2075.

In a battle of the experts, the Plan Administrator is ordinarily vested with discretion to credit one side over the other.[86] This case is not ordinary. Here, Unum did not reference or provide any of Greer's material and substantial duties when its clinicians and Independent Medical Examiner evaluated whether she was disabled.

Unum instead asked:

> Does the medical information in the file provide support for impairment to preclude EE from performing the occupational requirements as specified in 9/30/15 forum? . . . . [Per 9/29/15 forum] Based on review of JD, occupation requires lifting 10 pounds, mostly sitting, occasional stand/walk, and frequent fingering/keyboarding.[87]

> Based on data received since prior file review of 10/9/15 (including PV and SSDI claim file), is there ongoing evidence of inability to sustain sedentary physical/exertional capacity as outlined by SVRC to include lifting occasionally to

---

[86] *Gothard v. Metropolitan Life Ins.Co.*, 491 F.3d 246, 249 (5th Cir. 2007) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003)) ("A plan administrator need not defer to the opinion of a treating physician over that of a reviewing physician, who, based on the medical evidence in the record, reaches a different conclusion.").

[87] Docket No. 34-2 at 786 (Oct 2015 Medical Review).

> 10# as well as frequent sitting, fingering, key-boarding; occasional standing and walking?[88]

Unum asked the IME:

> "After reviewing all evidence currently available, do you feel that Ms. Susan Greer is capable of performing full time work within the sedentary range of functional demands as defined below?" . . . . Sedentary Work: frequent sitting, fingering and keyboarding; occasional standing, walking, and lifting up to 10 pounds.)[89]

Neither Unum's Clinicians nor Dr. Lee were provided the EDot Report to answer these questions. Instead, the record shows, at most, that they were given iterations of the Occupational Information Summary or merely told to use the standard for "sedentary work." Without the full claim file, however, their resulting opinions were incomplete.

The Court is not persuaded that Unum reasonably considered the EDot Report, despite referencing it in its denial letter and denial of appeals letter. The Record shows that prior to the denial letter, no one had considered the EDot Report. Dr. Beaver's assessment, regarding the appeal, did reference the EDot report, but up until that point, the entire Record had completely ignored it.

---

[88] Docket No. 45 at 1949 (July 2016 Medical Review).

[89] *Id.* at 2075-6.

32

### C.      Procedural Unreasonableness

"Procedural unreasonableness is important in its own right."[90] While not an independent basis for finding an abuse of discretion, procedural unreasonableness 'is a factor that informs whether the reviewing court may give more weight to the plan administrator's conflict of interest.'"[91]

Typically, procedural unreasonableness is found in situations akin to *Glenn v. MetLife*. In *Glenn*, the Plaintiff secured a favorable disability determination from the SSA, and in turn, MetLife was reimbursed by the plaintiff. MetLife ultimately terminated the Plaintiff's LTD benefits, but it did so without acknowledging the SSA decision, which was contrary to its own. The Sixth Circuit held that "having benefitted financially from the government's determination that Glenn was totally disabled, MetLife obviously should have given appropriate weight to that determination."[92]

The Fifth Circuit agrees: lack of acknowledgement of a contrary SSA determination demonstrates that the plan administrator failed to consider all relevant evidence, thus, even if the plan administrator's decision was based on substantial evidence—the way it derived at its decision, renders it

---

[90] *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 471 (5th Cir. 2010) (quoting *Glenn*, 128 S. Ct. at 2352).

[91] *Burell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 139 (5th Cir. (2006)) (quoting *Schexnayder*, 600 F.3d at 469-71).

[92] *Glenn v. MetLife (Metro. Life Ins. Co.)*, 461 F.3d 660, 669 (6th Cir. 2006).

procedurally unreasonable.[93] A plan administrator's failure to "at least acknowledge[]"an award of Social Security disability benefits constitutes procedural unreasonableness.[94] Yet determinations by the SSA disability program are not binding upon a plan administrator ("[d]ifferences between the Social Security disability program and ERISA benefits plans caution against importing standards from the first into the second.").[95] Moreover, plan administrators are not required to give the SSA decision any special weight ("[w]e do not require Hartford to give any particular weight to the contrary findings; indeed, Hartford could have simply acknowledged the award and concluded that, based on the medical evidence before it, the evidence supporting denial was more credible.").[96]

The Fifth Circuit's decision in *White v. Life Ins. Co. of N. Am.* ("LINA") is illustrative. There, the court found procedural unreasonableness where LINA failed to address evidence contrary to its denial. Specifically, an expert stated that based on toxicology results, the death certificate, and the collision report, it was impossible to determine the degree of White's intoxication at the time of his death.[97] Nevertheless, LINA denied life insurance benefits because White's death was, at

---

[93] *See Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d at 471 n.3.

[94] *Id.* at 471.

[95] *Hammond v. UNUM Life Ins. Co. of Am.*, 2008 U.S. Dist. LEXIS 31148, *11 (S.D. Miss. 2008).

[96] *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d at 471 n.3.

[97] *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 768 (5th Cir. 2018).

least in part, caused by his own intoxication.[98] In denying White's benefits, LINA failed to mention the expert's report. The Fifth Circuit held that "even if substantial evidence supported LINA's decision, the method by which it made the decision was unreasonable."[99] LINA's failure to address the report in its denial letters constituted procedural unreasonableness.

In the present case, as in *White*, the administrative documentation failed to paint the complete picture. Specifically, upon receipt of the SSA case file, Unum found it lacking any decisional information or rationale. Unum's consultant reviewed and noted that she was "unable to advise [Unum] of the medical basis of SSA Approval, Physical or Mental as such detail is not contained in the SSDI claim file received."[100] She added that the SSA file "does NOT contain any completed Mental Residual Function Capacities (MRFC) assessments."[101] The consultant's report effectively stated that the reasoning for the SSA's disability determination could not be assessed, and thus any positions on the SSA's disability determination could only be conjecture.

---

[98] *Id.* at 766.

[99] *Id.* at 768 (quoting *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d at 470).

[100] Docket No. 45 at 1943.

[101] *Id.*

35

The Record shows that Unum then requested the files directly from the SSA twice, and again, they were identical to those provided by Greer.

Here, as in *Glenn*, Greer was awarded Social Security disability benefits retroactive to the date of the accident, May 22, 2014, and was required to reimburse Unum $17,912. Unum financially benefitted from Greer's SSA eligibility. Yet, in its termination letter, Unum failed to mention its own consultant's report and instead opined that the SSA benefits were granted because of mental illness, which Greer was no longer eligible to claim.[102]

Unum's failure to address its consultant's report, in which she found that there was no way to glean the basis for the SSA disability determination, was procedurally unreasonable. Procedural unreasonableness is a factor to be considered in the Court's abuse of discretion analysis and can justify giving more weight to a plan administrator's conflict of interest.

Unum points to *Wittmann v. Unum Life Ins. Co. of Am.*, an unpublished opinion with similar facts. There, the Fifth Circuit held that Unum's decision to limit Wittman's disability benefits to only 24 months, using the same mental health exhaustion clause, based on an incomplete SSA file, and the inclusion of a psych evaluation – despite its own experts determination that Wittman did not suffer from any mental illnesses – did

---

[102] Docket No. 58 at 32.

not rise to an inference of bad faith."[103] The Court reasoned that "Unum had reason to think that the Social Security Administration based an award of disability benefits to Wittmann on a determination that she had a mental illness."[104]

Unlike *Wittman*, this Court's holding is based on Unum's failure to address its own consultant's report, regardless of whether there was reason to believe that the SSA decision was based, at least in part, on Greer's mental health. "The conflicted administrator's failure to address evidence in the record contrary to its denial was an abuse of discretion."[105]

Moreover, Unum did not cure its failure to disclose in its letter denying benefits on appeal. In it, Unum added that it failed to obtain the diagnosis for the SSA determination but still failed to address or acknowledge the relevant report. Thus, the record reveals that Unum's management of Greer's claim amounted to procedural unreasonableness.

### D.    Conflict of Interest

The parties do not dispute that Unum has a conflict of interest. Unum, however, contends that its conflict did not affect its decision, and cites as support cases highlighting it for

---

103 *Wittmann v. Unum Life Ins. Co. of Am.*, 793 F. App'x 281, 286 (5th Cir. 2019).

104 *Id.*

105 *White v. Life Ins. Co. of N. Am.*, 892 F.3d 762, 771 (5th Cir. 2018) (citing *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 471 (5th Cir. 2010)).

"reforming its practices,"[106] implementing "strong new processes,"[107] ending "systemic misconduct,"[108]—all resulting in a "change in corporate culture."[109] Greer counters by pointing to case law reiterating Unum's "well-documented history of abusive tactics."[110]

We need not survey the numerous non-binding cases cited by the parties. The conflict of interest is obvious and undisputed. The critical question, instead, is how much weight to give to Unum's conflict of interest based on a "case-specific" review of the complete administrative record before it. Put otherwise, this Court must decide whether "circumstances" "suggest a higher likelihood that" Unum's conflict "affected the benefits decision."[111]

A structural conflict is presumed where the insurer of the plan both evaluates and pays benefit claims,[112]—as is the case

---

[106] Docket No. 58 at 28 (quoting *Chaudhry v. Provident Life and Accident Insurance Company*, 2014 WL 3511529, *17 (N.D. Ill. 2014)).

[107] *Id.*

[108] *Id.* at 29 (quoting *Mercado v. First Unum Life Ins. Co.*, 2013 WL 63310, *27 (S.D.N.Y. 2013)).

[109] *Id.* at 28 (quoting *Chaudhry v. Provident Life and Accident Insurance Company*, 2014 WL 3511529, at *17).

[110] *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2nd Cir. 2008).

[111] *Truitt v. Unum Life Ins. Co. of America*, 729 F. 3d 497, 514-15 (5th Cir. 2013) (citing *Glenn*, 554 U.S. at 117).

[112] *Nichols v. Reliance Std. Life Ins. Co.*, 924 F.3d 802, 813 (5th Cir. 2019) (citing *Glenn*, 554 U.S. at 108); *see also Glenn*, 554 U.S. at 127 ("A third-party insurance company that administers an ERISA-governed disability plan

38

here—because the insurer potentially benefits from every denied claim.[113] The Supreme Court has held that a conflict is one of several different considerations that must be weighed as a factor in determining whether there is an abuse of discretion. In *Metro. Life Ins. Co. v. Glenn*, the Court held that "the conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."[114] It is also appropriate to weigh a conflict greater "where circumstances surrounding the plan administrator's decision suggest procedural unreasonableness."[115] It is the Plaintiff's responsibility to come forward with this evidence.[116] "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy."[117] "The court should also factor in any steps taken by the administrator to reduce potential bias and promote accuracy."[118]

---

and that pays for benefits out of its own coffers profits with each benefits claim it rejects.") (Scalia, J., dissenting).

[113] *Id.* (citing *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 470 (5th Cir. 2010)).

[114] *Glenn*, 554 U.S. at 117.

[115] *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d at 469.

[116] *George v. Reliance Stand. Life Ins. Co.*, 776 F.3d 349, 352 (5th Cir. 2015).

[117] *Glenn*, 554 U.S. at 117.

[118] *Holland*, 576 F. 3d at 248-49 (5th Cir. 2009).

Unum has a well-documented history of poor claims practices, which it acknowledges. In *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefits Denials Under ERISA*, John Langbein exposed what he called Unum's deliberate program to deny meritorious claims. In *Glenn*, the Supreme Court targeted Unum as a bad actor. The Court would be remiss in not acknowledging Unum's history, but will not assume that Unum is deserving of a heightened weight in every case to which it is a party because it employed unscrupulous claims practices in the past.[119]

Greer points to Unum employees and consultants that have been the subject of unfavorable court proceedings as evidence that Unum's conflict should be weighed more heavily. The Court is not persuaded by Greer's arguments that Unum employs the same bad actors to undermine legitimate claims. Such cases may not be a representative sampling because most claims do not become the subject of litigation.[120]

The Record, exceeding 3,000 pages, reflects that Unum's evaluation of Greer's claim was extensive. Unum also chose to involve an Independent Medical Examiner, another factor that credits Unum's efforts in administering an unbiased claim.

Here, the presumption of an inherent conflict of interest is neither overcome nor determinative. As discussed in Section

---

[119] *See Kamerer v. Unum Life Ins. Co. of America*, 251 F. Supp. 3d 349, 352 (D. Mass. 2017).

[120] *See Caskey v. Prudential Ins. Co. of Am.*, 473 F. Supp. 3d 644, 674 (M.D. La. 2020).

II.C., however, the Court holds that Unum's administration of Greer's claim was procedurally unreasonable, a factor that affords Unum's conflict of interest greater weight, even if only slightly. The Fifth Circuit has noted that "any one factor may act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tie-breaking factor's inherent or case-specific importance."[121]

Considering Unum's lack of substantial evidence in light of its failure to assess the material and substantial duties of Greer's regular occupation in accordance with the Plan, procedural unreasonableness, and conflict of interest, the Court holds that Unum abused its discretion in denying benefits.

## IV.

### Attorneys' Fees

Under ERISA, any action by a participant, beneficiary, or fiduciary, the court in its discretion, may allow a reasonable attorney's fee and costs of actions to either party.[122] The Fifth Circuit has held that "[i]f an administrator has made a decision denying benefits when the record does not support such a denial, the court may, upon finding an abuse of discretion on the administrator's part, award the amount due on the

---

[121] *Schexnayder v. Hartford Life & Accident Ins. Co.*, 600 F.3d 465, 469 (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)) (citations omitted.)

[122] 29 U.S.C. § 1132(g)(1).

claim and attorney's fees."[123] There is "a strong presumption that the court will award costs to the prevailing party."[124]

The Fifth Circuit has explained that:

> The following five factors were enumerated for consideration in ERISA cases when shifting attorneys' fees: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position. Absent is any requirement that the party under consideration for fee-shifting under this test be the prevailing one.[125]

---

[123] *Estate of Bratton v. National Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir. 2020) (quoting *Vega v. National Life Ins. Services*, 188 F.3d 287, 295, 302 (5th Cir. 1999); *see also Salley v. E. I. Du Pont de Nemours & Co.*, 966 F.2d 1011, 1014 (5th Cir. 1992).

[124] *Clouse v. Wal-Mart Stores*, 2007 U.S. Dist. LEXIS 117872, *17 (M.D. La. 2007) (quoting *Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 539 (5th Cir. 1990)); *see also Salley*, 966 F.2d at 1017.

[125] *Wade v. Hewlett-Packard Dev. Co. LP Short Term Disability Plan*, 493 F.3d 533, 543 (5th Cir. 2007) (citing *Iron Workers Local #272 v. Bowen*, 624 F.2d 1255 (5th Cir. 1980)).

"No one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address in applying the relevant costs and attorneys' fees provision of ERISA."'[126]

In this case, the Court has found that Unum abused its discretion in denying Greer's LTD benefits. Thus, there is a strong presumption in favor of awarding Greer, the prevailing party, attorneys' fees. After consideration of the five factors enumerated in *Iron Workers Local #272*, the Court finds an award of attorneys' fees appropriate. The Court will address each factor in turn.

First, Greer has dedicated much of her briefs to allegations of bad faith and misconduct. On the Record before the Court, such claims are not persuasive. Second, Unum is able to satisfy Greer's attorneys' fees. Third, arguably, an award of attorneys' fees will incentivize Unum and other fiduciaries to better promote accuracy in claims' administration. Specifically, deterring a lack of fidelity to their own plan language. Fourth, Greer does not seek to benefit a class of participants, but her arguments do pose a significant legal question: whether the Fifth Circuit will definitively align with its sister courts in distinguishing between the "any occupation" and "own occupation" standards.[127] Finally, the merits of Greer's

---

[126] *Hughes v. Legion Ins. Co.*, 2007 U.S. Dist. LEXIS 17255, *31-32 (S.D. Tex. 2007) (quoting *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 821 (5th Cir. 1997)) (quotations omitted).

[127] *See Foster v. Principal Life Ins. Co.*, 920 F.3d 298, 305 (5th Cir. 2005)

arguments prevailed. The presumption in favor of awarding the prevailing party attorneys' fees, factors (2), (5), and even if only slightly, (3) and (4) weigh in favor of granting Greer's attorneys' fees. While no factor is decisive, the Court, in its discretion, finds it appropriate here.

The plaintiff's motion for attorneys' fees (with supporting evidence) is due in 21 days.

**SO ORDERED**, this the 30th day of September, 2021.

s/ CARLTON W. REEVES
*United States District Judge*

44